UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MICHAEL C. RYAN                                                    PLAINTIFF

V.                                          CIVIL ACTION NO. 3:18-CV-558-DPJ-FKB

UNITED STATES DEPARTMENT                                          DEFENDANT
OF COMMERCE

ORDER

Defendant United States Department of Commerce seeks dismissal of and summary

judgment on Plaintiff Michael C. Ryan's claims in this employment-discrimination and

retaliation case.  For the following reasons, Defendant's Motion for Summary Judgment [63] is

granted as to the Title VII race-discrimination and retaliation claims but denied as to the hostile-

work-environment claim.  The Motion to Dismiss [61] is denied as moot.

I.      Facts and Procedural History

Ryan has at all relevant times been employed as an Electronics Systems Analyst in the

Jackson, Mississippi, office of the National Weather Service ("NWS").[1]  In that capacity, he

supervises other employees and answers only to a meteorologist in charge ("MIC"), who serves

as Ryan's immediate supervisor.  Since November 2016, that position has been held by William

Parker, a Black male.

According to Ryan, Parker discriminated against him because of his race (White),

subjected him to a race-based hostile work environment, and retaliated after Ryan complained

about racial discrimination.  Ryan asserted these claims under Title VII, suing Defendant on

---

[1] The NWS is a component of the National Oceanic and Atmospheric Administration
("NOAA"), which is a bureau of the United States Department of Commerce.

August 17, 2018.  Defendant filed its dispositive motions after discovery closed, the briefing on those motions is complete, and the Court has personal and subject-matter jurisdiction.

II.     Standard

Defendant seeks an order of dismissal under Rule 12(c) while separately seeking summary judgment under Rule 56 based largely on the same arguments.  At this late stage of the case, and given the extensive record, the Court finds that the Rule 12(c) motion is moot because it will rule based on the Rule 56 motion.

Summary judgment is warranted under Rule 56(a) when evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and

legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

In this case, Ryan's memorandum offers many factual assertions without record citations. Notably, the Court has no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379–80 (5th Cir. 2010) (quoting *Malacara v. Jarber*, 353 F.3d 393, 405 (5th Cir. 2003)); *see also* Fed. R. Civ. P. 56(c)(1)(A). So, while the evidence supporting Ryan's assertions may be somewhere within the 1,630 pages he attached to his response, absent proper citation, the Court finds such arguments unsubstantiated.

Finally, when responding to a summary-judgment motion, the non-movant "must identify specific evidence in the record and articulate the manner in which that evidence supports [his] claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010); *see also Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (same). Here, Ryan offers a long factual account of this dispute, but his legal arguments sometimes fail to go beyond the applicable legal standards.

This problem is exacerbated to some extent by his 39-page affidavit which "is adopted by reference" in his summary-judgment response. *See* Pl.'s Mem. [69] at 35. Such a citation is improper under Rule 56(c) because it does not identify the "particular parts" of the record or even the legal and factual arguments the affidavit supposedly supports. Also, the affidavit itself attempts to synthesize and then argue the case but is inadmissible to the extent it is not based on personal knowledge, conveys hearsay, and speculates regarding others' motives and thoughts. Finally, some of the legal arguments in the affidavit conflict with the arguments offered in

Ryan's legal memorandum.  The Court has fully considered the admissible statements in the affidavit, but it has looked to Ryan's legal memorandum prepared by counsel for the legal arguments.

III.    Preliminary Issues

    A.    Failure to Exhaust

Title VII "permits most federal employees to seek relief from proscribed discriminatory employment practices in [f]ederal [d]istrict [c]ourt.  As a precondition to seeking this judicial relief, however, complaining employees must exhaust their administrative remedies by filing a charge of discrimination with the EEO division of their agency." *Pacheco v. Mineta*, 448 F.3d 783, 787–88 (5th Cir. 2006).  The Court "interprets what is properly embraced in review of a Title-VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which 'can reasonably be expected to grow out of the charge of discrimination.'"  *Id.* at 789 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

In his Complaint and during discovery, Ryan identified a slew of allegedly discriminatory and/or retaliatory acts.  Of those, Defendant identified five categories of conduct Ryan failed to include in his EEO complaints:  (1) Parker gathering information about or asking subordinates about Ryan's work; (2) Parker's non-cooperation with Ryan in performing work; (3) Parker making false statements to harm Ryan; (4) Parker's obstruction of Ryan's due-process rights; and (5) Parker's refusal to entertain Ryan's requests for a new supervisor.  Defendant also says Ryan "has not exhausted his retaliation claim for any of the acts alleged in his second EEO complaint," which "did not mention retaliation."  Def.'s Mem. [64] at 17.

Ryan never contests Defendant's argument that these incidents were not exhausted and therefore cannot form the basis of claims based on discrete acts of discrimination and/or retaliation.  Instead, he argues that the Court should consider "the [entire] flow of events showing William Parker's racist attacks against Michael Ryan."  Pl.'s Mem. [69] at 30.  In other words, while Ryan may not have exhausted as to the individual acts Defendant identified, those acts are still "relevant, and may be used to illuminate current practices."  *Id.* at 28 (quoting *Downey v. S. Nat'l Gas Co.*, 649 F.2d 302, 305 (5th Cir. 1981) (ellipses omitted)).

Ryan's argument is correct, *as far as it goes*.  The Fifth Circuit "has repeatedly approved of the introduction of previous conduct to illuminate currently actionable issues in discrimination and harassment cases."  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009).  And Ryan does not seem to suggest that the unexhausted complaints constitute discrete acts of actionable discrimination.  To the extent he does suggest this, his failure to exhaust those claims entitles Defendant to summary judgment on them.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

B.      Failure to Timely Counsel

In a similar argument, Defendant contends that any alleged acts of discrimination occurring more than 45 days before Ryan first initiated contact with an EEO counselor are time-barred.  Pursuant to applicable regulations,

> Aggrieved persons who believe they have been discriminated against on the basis of race . . . must consult a Counselor prior to filing a complaint . . . .  An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . .

29 C.F.R. § 1614.105(a)(1); *see Smith v. Johnson*, 647 F. App'x 377, 378 (5th Cir. 2016) ("A federal employee's failure to seek informal counseling within 45 days of an adverse employment event bars him from pursuing the claim.").

Ryan first contacted an EEO counselor on May 2, 2017.  Agency Decision [63-2] at 1–2. Therefore, Defendant argues, claims based on alleged discriminatory acts occurring more than 45 days before then—or before March 18, 2017—were not timely counseled and cannot be considered.  Defendant identifies six incidents that fall into this category:  (1) Parker's January 2017 statement that Ryan's attitude was a problem; (2) Parker asking Ryan's subordinate to challenge Ryan's work in January 2017;  (3) Parker's January 2017 threat to discipline Ryan for an inappropriate email; (4) Parker's January 2017 statement that Ryan had broken his trust; (5) Parker's February and early-March interactions with Ryan over a software-writing assignment; and (6) Parker's February 2017 comment that Ryan should meet with Parker in an effort to keep his job.  Def.'s Mem. [64] at 19.

Ryan never mentions the alleged failure to counsel, but he does state in his exhaustion analysis that the "Court may consider time-barred acts . . . insofar as they are relevant to a Defendant's motive."  Pl.'s Mem. [69] at 27.  Again, the Court may consider these acts to the extent they are probative of the claims that are not time-barred, but summary judgment is granted on any Title VII disparate-treatment claim based on these older acts.[2]

IV.    Disparate-Treatment Race-Discrimination Claim

Title VII precludes discrimination "because of [an employee's] race, color, religion, sex, and national origin."  42 U.S.C. § 2000e-2(a).  "In employment discrimination cases, a plaintiff may present his case by direct or circumstantial evidence, or both."  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002).  Ryan asserts that this is a direct-evidence case.

---

[2] As discussed below, the acts taken before this 45-day window were also before Ryan first engaged in protected activity.  Accordingly, this analysis does not impact the retaliation claim. That said, to the extent Ryan says he engaged in protected activity sooner than the Court has found, nothing before March 18, 2017, could be considered an adverse employment action.

Pl.'s Mem. [69] at 19.  Defendant argues the case under the burden-shifting analysis applicable

to circumstantial-evidence cases following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802 (1973).

A.    Direct Evidence

"Direct evidence is evidence which, if believed, proves the fact without inference or

presumption."  *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).  For workplace comments

> to provide sufficient evidence of discrimination, they must be "1) related [to the
> protected class of persons of which the plaintiff is a member]; 2) proximate in
> time to the [complained-of adverse employment decision]; 3) made by an
> individual with authority over the employment decision at issue; and 4) related to
> the employment decision at issue."

*Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400–01 (5th Cir. 2000) (quoting

*Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).

Ryan correctly quotes these standards in his summary-judgment response but never

explains how they apply to this case.  Most notably, his direct-evidence analysis never identifies

direct evidence discussing a specific adverse employment action.  Instead, he simply says that

"William Parker has clearly declared his overt racism, by his words, his actions, and his flagrant

denial of hiring, or promotions, or opportunities based solely on race."  Pl.'s Mem. [69] at 19.

Ryan then concludes his analysis without discussing three of the four factors for direct evidence,

arguing only that Parker was a supervisor with authority over employment decisions.  *Id.* at 21.

These conclusory assertions are insufficient, *TIG Ins. Co.*, 276 F.3d at 759, and Ryan has

not "identif[ied] specific evidence in the record and articulate[d] the manner in which that

evidence supports [his] claim" as to each element of the direct-evidence test, *Duffie*, 600 F.3d at

371.  Nevertheless, the Court endeavored to consider the record as a whole and found no

statements referenced in Ryan's brief that would fully satisfy the direct-evidence test as to a

legitimate adverse employment action.  *See Brown*, 82 F.3d at 655.

> B.      Circumstantial Evidence

Turning to the *McDonnell Douglas* burden-shifting analysis applicable to circumstantial

evidence, it is not apparent that Ryan pursues such a claim.  While he mentions this theory as

being the alternative to a direct-evidence case, he flatly states that "this is a direct[-]evidence

case."  Pl.'s Mem. [69] at 19 (style altered).  And consistent with that approach, Ryan mostly

ignored Defendant's argument that he cannot make a circumstantial case.  Thus, to the extent he

has relied exclusively on a direct-evidence theory, his disparate-treatment claim must be

dismissed.

That said, even assuming Ryan intended to pursue a circumstantial case, he could not

state a prima facie case.

> Under [the *McDonnell Douglas*] framework, the plaintiff must first establish a
> prima facie case of discrimination, which requires a showing that the plaintiff (1)
> is a member of a protected group; (2) was qualified for the position at issue; (3)
> was discharged or suffered some adverse employment action by the employer;
> and (4) was replaced by someone outside his protected group or was treated less
> favorably than other similarly situated employees outside the protected group.

*McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  Here, Defendant says that the

only exhausted adverse employment action Ryan suffered was a five-day suspension without

pay.  *See* Def.'s Mem. [64] at 22–24.  Ryan never argues otherwise.[3]

---

[3] As noted, Ryan never fully addresses the prima facie case for race-based discrimination, but his
fact section does mention actions that he viewed as "materially adverse."  Pl.'s Mem. [69] at 11.
Assuming such issues had been exhausted, and assuming further they were referenced for the
race-discrimination claim rather than the retaliation claim, "an employment action that 'does not
affect job duties, compensation, or benefits' is not an adverse employment action."  *Pegram v.
Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (quoting *Banks v. E. Baton Rouge Par. Sch.
Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).  Absent response from Ryan disputing Defendant's
argument that the suspension was the only adverse action, the Court will focus on that decision.

While the suspension was an adverse employment action, Defendant argued in its opening memorandum that Ryan has never identified a valid comparator, the fourth essential element of his prima facie case. *Id.* at 24. To establish that element, a plaintiff must "proffer[] a fellow employee as a comparator [and] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Refin. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)).

Ryan does acknowledge this argument, but he never offers a comparator. Instead, he asserts that the United States Supreme Court struck this element in *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Pl.'s Mem. [69] at 34. *Ash* did no such thing, and the Fifth Circuit still requires this essential element. *See Harris v. Drax Biomass Inc.*, 813 F. App'x 945, 948 (5th Cir. 2020) (affirming summary judgment and finding employee failed to establish a prima facie case of discrimination because he failed to show he "was treated less favorably than a similarly situated comparator of another race"). Defendant's motion for summary judgment is granted on the race-discrimination claim.[4]

## V.   Retaliation Claim

Ryan says Defendant retaliated against him after he complained about Parker's discrimination and harassment. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) [he] engaged in protected activity; (2) the employer took a materially adverse action against [him]; and (3) a causal link exists between [the] protected activity and the adverse action." *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). If he makes that showing, then the case follows the normal burden-shifting analysis.

---

[4] The suspension is discussed at length in the retaliation section of this Order. And for the reasons stated there, even if Ryan reached the final stages of the burden-shifting test, his race-discrimination claim still fails.

"An employee has engaged in activity protected by Title VII if [he] has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)).

A materially adverse action is "one that would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Stewart*, 586 F.3d at 331 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The purpose of this objective standard is 'to separate significant from trivial harms' and 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 68).

Defendant argues that Ryan's retaliation claim fails for four reasons:  (1) most of the acts he complains about occurred before he participated in protected activity or Parker learned of his protected activity; (2) the conduct occurring after Parker learned of his protected activity was not materially adverse; (3) even assuming a materially adverse employment action took place after Parker learned about the protected activity, there was no causal connection; and (4) Defendant had a legitimate non-retaliatory reason for its actions.  Def.'s Mem. [64] at 30–34.  Ryan never fully addresses these issues in the legal-analysis section of his brief, but he touches some of them when presenting the facts.  This Order will start with his legal analysis—which discusses retaliation against another employee—and then address the points found in other sections of his memorandum.

Ryan opens the retaliation section of his brief by arguing that "[e]vidence about discrimination against other members of the protected class in the same workplace may

10

sometimes be probative to reinforce allegations that harassment affected a plaintiff's terms and conditions of employment." Pl.'s Mem. [69] at 32 (citing *Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 400 (5th Cir. 2016) (holding in hostile-working-environment context that evidence of discrimination against co-workers "may sometimes be probative to reinforce allegations that harassment affected the plaintiff's terms and conditions of employment")). Ryan then says Parker retaliated against co-worker Mark Wilson by recording a conversation with him, *id.* at 24, and by wadding up a union grievance about race-based bias and throwing it in Wilson's face, *id.* at 32. Ryan concludes by arguing that "[t]he *Burlington Northern* standard makes clear that a genuine issue of material fact exists for whether the conduct against Ryan was such that it 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 34 (quoting *Burlington N.*, 548 U.S. at 68). Such conclusory assertions are not enough to avoid summary judgment and fail to explain how the alleged acts against him can avoid Defendant's legal arguments. *See Duffie*, 600 F.3d at 371 (noting that non-movant must identify the "specific evidence in the record and articulate the manner in which that evidence supports [his] claim").

Nevertheless, Ryan mentions numerous conflicts with Parker and others in the facts section of his memorandum, some of which he expressly identifies as retaliatory or materially adverse. Other alleged acts are not identified as retaliatory or materially adverse, nor could they be. Absent a more direct argument from Ryan listing what he contends to be the materially adverse actions, the Court will not speculate about each incident listed in his facts and will instead focus on those acts he specifically identified as retaliatory. *Id.*[5]

---

[5] Whereas Ryan identifies only some acts as retaliatory, he argues that the Court should consider "the [entire] flow of events showing William Parker's *racist* attacks against Michael Ryan." Pl.'s Mem. [69] at 30 (emphasis added).

A.      Timing of Protected Activity and Notice

As to those acts Ryan identified as retaliatory, the Court must first determine whether

they fall within the temporal range of potentially viable retaliation, a task that begins with

determining when Ryan engaged in protected conduct and when Defendant discovered it.  Here,

Defendant says Ryan engaged in protected activity on May 2, 2017, when he initiated contact

with an EEO counselor and that Parker "did not learn of Plaintiff's participation in protected

activity until mid-September 2017."  Def.'s Mem. [64] at 31 (citing Parker Decl. [63-23] at 3 ("I

first learned of the discriminatory harassment allegation . . . in mid[-]September 2017.")).

According to Defendant, any adverse actions before Parker's knowledge would not be

causally related to Ryan's opposition to racial bias.  Defendant's legal argument is correct.  Acts

occurring before "the employer knew about the employee's protected activity" are not causally

related to the protected activity.  *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017).  But

the factual argument is materially disputed.

Ryan addresses the notice issue in the facts section of his memorandum, arguing that he

engaged in protected activity on April 18, 2017.  *See* Pl.'s Mem. [69] at 7.  On that day, he

responded to an email from Parker complaining about Ryan's "inappropriate, out of line, and

disappointing" conduct at an earlier meeting.  Def.'s Docs. [68-17] at 58.  Ryan's response

accused Parker of creating a "hostile environment."  *Id.* at 56.

An email complaining about race-based discrimination is considered opposition to

discrimination; Title VII therefore protects the sender from retaliation.  *See Ganheart v. Brown*,

740 F. App'x 386, 390 (5th Cir. 2018) (concluding that complaints of racial bias stated in email

constituted opposition).  But Ryan's April 18, 2017 email is a bit different because it mentioned

a hostile work environment but never stated that it was based on race.  *See Davis v. Dall. Indep.*

*Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (per curiam) (holding that general complaint of "hostile work environment" was not protected activity because it "lacked a racial or gender basis"); *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 396 (5th Cir. 2008) (finding no protected activity because plaintiff's complaint of unfair treatment never referred to the discriminatory treatment as age-based).

Ryan does, however, point to subsequent emails in late April and early June 2017 as establishing notice. Pl.'s Mem. [69] at 7. First, he notes that on April 25, 2017, Parker emailed Ryan acknowledging the "[a]llegations of [h]arassment" and informing Ryan that he had "the right to seek counseling from the Office of Civil Rights." Def.'s Docs. [68-18] at 7. Thus, it appears that Defendant construed the April 18 email as asserting protected rights. Second, emails in June 2017 informed Parker that the "EEO mediation" with Parker had been cancelled. *Id.* at 11. That communication came after the May 2, 2017 EEO complaint. So, while Parker may not have known about the formal EEO complaint until September, as Defendant argues, there is a question of fact whether he and others knew Ryan engaged in protected activity on April 18, 2017. Nothing that happened before that date can be causally related to the protected activity. *EmCare, Inc.*, 857 F.3d at 683 (noting that acts before knowledge are not causally related).[6]

In addition to the notice issue, some claims were never exhausted or fall outside the 45-window of viable claims. As noted above, even if Ryan complained about race before April 18, 2017, no discrete acts occurring before March 18, 2017, could have constituted an actionable

---

[6] The parties have not addressed whether Title VII's anti-retaliation provision protects an employee who makes a general complaint about bad treatment, but the employer construes it as opposing discrimination. This Order will not explore that issue and merely assumes *arguendo* that notice occurred on April 18. Regardless, a clear question of fact exists as to whether Defendant had notice in June 2017.

adverse employment action.  In addition, Ryan never addressed Defendant's argument that he failed to assert retaliation as to the alleged mistreatment contained in his second EEO complaint filed on September 11, 2018.  *See* Def.'s Mem. [64] at 17; *see also* 2018 ROI [68-4].  That EEO complaint listed alleged mistreatment starting in April 2018 and did not claim that it resulted from Title VII retaliation.  Absent response, the events contained in that EEO complaint may not be considered as part of the retaliation claim.

With those temporal parameters, the Court turns to the acts Ryan specifically identified as being retaliatory in his memorandum of law.

B.     Specific Acts of Retaliation

1.     Light Bulb Incident

Ryan asserts that Parker retaliated by making Ryan change a light bulb.  *See* Pl.'s Mem. [69] at 4; Def.'s Docs. [68-17] at 19.  Aside from being trivial, that incident happened in January 2017, before Ryan engaged in Title VII activity and outside the 45-day window of timely filed claims.

2.     Digging Up Dirt

In his most direct comment on retaliation, Ryan states that "[a]fter [he] filed with the EEOC, within 24 hours harassment from Parker ensued."  Pl.'s Mem. [69] at 10.  He links that argument to his statement that Parker began digging up dirt on Ryan after the April 18, 2017 email and that "[s]uch actions . . . were 'materially adverse.'"  *Id.* at 11 (citing *Burlington N.*, 548 U.S. at 68).  The documents Ryan cites for this argument show management-level communications addressing Parker's concern over the tone of Ryan's communications—an issue that had been discussed months before the protected activity.  Others conveyed their adverse experiences with Ryan.  *See* Def.'s Docs. [68-17] at 47–50; 58; 60–65; 72–75; 78–83; Def.'s

Docs. [68-18] at 68–69; 72–78.  But Ryan did not dispute Defendant's argument that he failed to

exhaust this issue.  *See* Def.'s Mem. [64] at 17 (listing this issue among the unexhausted claims).

Accordingly, the digging-up-dirt aspect of the retaliation claim does not survive summary

judgment.[7]

3.  John Duxbury

In both his affidavit and his legal memorandum, Ryan repeatedly asserts that John

Duxbury also retaliated against him.  Duxbury was Chief of the Systems Operations Divisions

for the Southern Region, a management position above Parker.  According to Ryan, Duxbury

and Parker provided false information during a congressional inquiry about a fatal tornado in

Hattiesburg, Mississippi.  Ryan then sent an email to various recipients correcting his

supervisors' statements.  He maintains that Duxbury and Parker "retaliated against [him] for

correcting [the] false testimony."  Pl.'s Mem. [69] at 2 n.3; *see also* Ryan Aff. [68-1] at 15; Ryan

Dep. [63-1] at 12–16 (CM/ECF pagination); Pl.'s Mem. [69] at 9.  For starters, these events

occurred before the protected activity and outside the 45-day window of timely asserted claims.

In addition, Title VII precludes retaliation for complaining about discrimination based on "race,

color, religion, sex, and national origin," none of which this incident involves.  42 U.S.C.

§ 2000e-2(a).  As such, these events are untimely and not causally related to Ryan's complaints

of race-based discrimination.[8]

---

[7] Even if exhausted, Ryan was not aware of these emails when they occurred, so it is
questionable whether they could dissuade protected activity.  Moreover, the Court is reluctant to
say that examining an employee's work history when faced with a dispute like this constitutes a
materially adverse employment action.

[8] These same events regarding the congressional testimony may be relevant to statements Ryan
made in his affidavit about when Parker learned that Ryan had engaged in protected activities.
According to Ryan, "Parker was notified repeatedly between January 2017 and April 2017 of the
Plaintiff's claims of discrimination."  Ryan Aff. [68-1] at 3.  It is unclear what Parker was told

4.      Neglecting Maintenance

Another incident of alleged retaliation is that "Parker falsely accused Ryan of neglecting maintenance on his building."  Pl.'s Mem. [69] at 8.  The evidence Ryan cites to support this argument is a 2013 quality-assurance checklist that predates Parker's tenure and fails to suggest a false accusation of neglect.  2017 ROI Part 2 [68-3] at 12.  That said, Ryan's affidavit also mentions issues with maintenance, though the context is different.  There, he quotes a May 19, 2017 reprimand he received for conduct unbecoming a federal officer.  Ryan Aff. [68-1] at 23.  The reprimand noted, among many other things, that when Parker asked a facilities chief why certain repairs had not been made, he responded, "Facilities personnel sometimes try to avoid working with [Ryan] due to [his] bullying and intimidation."  Reprimand [63-12] at 6 (quoted in Ryan Aff. [68-1] at 23).  If this is the same maintenance issue addressed in Ryan's brief, it does not appear to involve false claims of neglect and is instead one of the many communication issues addressed in the May 2017 reprimand.  *Id.*  That reprimand was the basis for the subsequent five-day suspension, which the Court will address next.

5.      Five-Day Suspension

Suspending Ryan for five days without pay constituted an adverse employment action.  *See* Pl.'s Mem. [69] at 8; *LeMaire v. La. Dept of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (holding that two-day suspension without pay was an adverse employment action).  Defendant acknowledges as much but argues that the suspension was not causally connected to

---

beginning in January 2017, but elsewhere in his affidavit, Ryan describes his correction of the information regarding the Hattiesburg tornado and the resulting retaliation as "the important events that unfolded in January 2017."  *Id.* at 15.  If those events constitute the "discrimination" about which he complained in January 2017, then Title VII does not address them.  It may be for that reason that Ryan's counsel chose not to argue that Ryan opposed discrimination under Title VII in January 2017, and as noted, the Court has focused on the legal arguments in Ryan's memorandum.

16

Ryan's complaints about race discrimination and that Defendant had a legitimate non-retaliatory reason for its decision that Ryan has not rebutted.

a.     Causation

Ryan factually disputes Defendant's argument that Parker and others discovered the protected activity after the suspension process began.  *See* Pl.'s Mem. [69] at 7.  As noted above, the date Defendant learned about protected activity is a question of fact, and it seems that the suspension was first mentioned after Parker knew Ryan had engaged in protected activities.

Defendant's stronger argument is that the actions it took *after* Ryan complained about race were based on events that occurred *before* he complained.  Even Ryan says that "Parker . . . decided to fire [him] the first day Parker met Ryan," which would necessarily have been before Ryan complained about Parker.  Pl.'s Mem. [69] at 2.  Ryan also states in his affidavit that Parker and Duxbury began retaliating against him in January 2017 for correcting their statements about the tornado in Hattiesburg.  Ryan Aff. [68-1] at 15–16.

There is evidence to support Ryan's conclusion that corrective actions were underway after that incident.  When another NOAA employee saw Ryan's email regarding the Hattiesburg tornado, he emailed Duxbury and asked, "Do you want me to ignore the tone of this email and let it go?"  Def.'s Docs. [68-18] at 40.  Duxbury responded on January 27, 2017, that he would discuss it with Parker and that "Bill [Parker] deserves a chance to set the tone with Mike [Ryan]. He should be aware that unless Mike's attitude improves[,] my rating of his office's performance will be less than successful."  *Id.*  Ryan takes from this that Duxbury planned in January 2017 to retaliate by "get[ting] with Parker to take action against me."  Ryan Aff. [68-1] at 16.  Thus, based on Ryan's own arguments and evidence, there is arguably no causal connection as to the

17

suspension.  Nevertheless, the Court will assume without deciding that Ryan states a prima facie case because he has not met his ultimate burden as to the suspension.[9]

b.      Legitimate Non-Discriminatory Reason and Pretext

Assuming Ryan has made the minimal showing for a prima facie case as to the five-day suspension, Defendant says it had a legitimate non-retaliatory reason for the decision, primarily to "stop Plaintiff's repeated argumentative, intimidating, and confrontational communication to ensure the efficient running of the regional and local offices."  Def.'s Mem. [64] at 34.  Ryan does not directly address this issue, but he does state that Defendant "totally ignore[s] well established Fifth Circuit law that always weighs competence rather than personality in discrimination cases."  Pl.'s Mem. [69] at 1 (citing *Blow v. City of San Antonio*, 236 F.3d 293 (5th Cir. 2001); *DeCorte v. Jordan*, 497 F.3d 433, 436 (5th Cir. 2007)).

If that argument is intended to address Defendant's burden at this stage of the analysis, it falls short.  Neither *Blow* nor *DeCorte* preclude reprimands for unprofessional conduct, and the Fifth Circuit has routinely found that inappropriate communications are a legitimate basis for discipline, including termination from employment.  *See, e.g.*, *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (finding that employee's insubordination during single telephone call

---

[9] The Court would not make that same assumption for Ryan's many complaints about conflicts with Parker.  As noted, the Court has limited its retaliation analysis to the alleged acts Ryan specifically identified as retaliatory.  But even if Ryan had argued that every incident listed in his response collectively constitutes retaliation, there would be no causal connection.  There was obvious bad blood between Parker and Ryan, and the general bickering and petty slights that started in January 2017 allegedly continued after Ryan engaged in protected activity months later.  The same is true for more serious allegations, like threatening to terminate Ryan's employment, telling Ryan he had broken Parker's trust, etc.  *See* Def.'s Mem. [64] at 19 (listing acts that occurred outside 45-day window of timely claims).  In any event, Ryan has not identified every act as retaliatory and has not endeavored to show that this pattern of conduct was tied to his complaint of racial discrimination.

constituted legitimate non-discriminatory reason for termination from employment).
Accordingly, the burden returns to Ryan to rebut Defendant's stated reason.

Ryan has not demonstrated pretext.  The record shows that Ryan's communication style
and personality raised concerns and drew reprimands for almost a decade before he engaged in
protected activities.  Beginning in 2008, at least three supervisors addressed Ryan's
communication skills with him.  First, former Jackson MIC Alan Gerard gave Ryan a Letter of
Counseling on April 12, 2010, for sending an email that was "accusatory and negative in tone
and style."  Counseling Letter [63-11] at 1.  The letter also referenced verbal counseling for
similar conduct in 2008 and 2009.[10]  *Id.*

Former acting MIC Steven Wilkinson had similar concerns that he also conveyed to
Parker.  Def.'s Docs. [68-17] at 76–77.  According to Wilkinson, an incident regarding an
abusive voice-mail message occurred just before Wilkinson left the Jackson MIC post.  *Id.* at 76.
Wilkinson wrote that he went to Ryan's office to "clear the air," but Ryan "accused me (through
yelling loudly) of believing" someone else's account.  *Id.*  Ryan recalls a hostile meeting with
Wilkinson but says Wilkinson was the one doing the yelling and being aggressive.  Ryan Dep.
[68-5] at 10.  Regardless, there was obviously a dispute with this MIC as well.

Wilkinson was replaced by MIC Chad Entremont, who reported that Ryan was an
"invaluable resource" but that his "exceptional work is often overshadowed by his attitude."

---

[10] Ryan states in a sworn affidavit that he "was not counseled in 2008 and 2009," but to support
that claim he cites a follow-up memorandum Gerard wrote after Ryan disputed the April 2010
written reprimand.  Ryan Aff. [68-1] at 5 (citing 2017 ROI Part 2 at 126–29).  In the follow-up,
Gerard wrote, "I have already counseled you in the past regarding these same issues."
Counseling Letter [63-11] at 4.  Gerard then reiterated: "I strongly feel that conducting negative,
potentially inflammatory communications in a public forum as you did on April 3rd brings
significant negative attention to you and your colleagues and other staff within SR.  This
potentially causes negative impacts to your career."  *Id.*  At bottom, Gerard issued a written
reprimand in 2010 and recorded that he had verbally done so before.

2017 ROI Part 2 [68-3] at 94.  Entremont also stated that after he left the Jackson MIC post,

Parker and Ryan did not get along and that "Ryan might raise his voice to the point of shouting"

at Parker.  *Id.* at 95.

Parker apparently raised similar concerns during Ryan's mid-term evaluation.  That

prompted another email on April 25, 2017, in which Ryan took issue with Parker's conclusion

and directed his supervisor to "[p]lease provide detailed references to support" the comments.

Def.'s Docs. [68-17] at 84.  Ryan told Parker in that same email that he rejected the "assertion

that [his] communications need to improve," and stated, "I reject outright you [sic] depiction of

how you have handled yourself or you [sic] introduction of new verbal exchanges to support

your position."  *Id.*  Ryan also re-asserted that Parker was creating a "hostile and unproductive

working environment."  *Id.*

Other flare ups occurred after that, and on May 19, 2017, Parker officially reprimanded

Ryan "for Conduct Unbecoming a Federal Employee."  Reprimand [63-12] at 1.  The nine-page

memorandum described Ryan's "combative and confrontational" behavior "over the years," *id.*

at 2, including specific instances of rude voicemail messages, inflammatory email messages, and

disruptive behavior in meetings, *id.* at 2–6.  Parker noted that Ryan's "confrontational attitude is

now affecting our office," *id.* at 6, and he warned Ryan "that if immediate and permanent

improvement is not made, it may result in more severe disciplinary action up to and including

removal from the federal service," *id.* at 8.

According to Parker, Ryan did not take the news well and spoke to his supervisor in an

"aggressive and threatening manner."  HR E-mail [63-34] at 2.  Parker also claims that Ryan said

he and his attorney "were in the process of asking for [Parker] to be removed as his Supervisor."

*Id.*  The two had three more exchanges on June 27, July 7, and July 18, 2017.  *Id.* at 2–3.

Ryan essentially disagrees with all that, stating that he never yelled at anyone and never stepped over the line.  Assuming he has created a question of fact regarding the verbal confrontations, Ryan must still "rebut each non-retaliatory reason articulated by" Defendant for the suspension.  *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 92 (5th Cir. 2019).  Notably, the suspension was based largely on Ryan's emails, the tone of which speaks for itself.

The Court will not catalog every written word in this substantial record and instead offers the following exchange as indicative of the tone Ryan set in his written communications.  *After* Parker gave Ryan the May 19, 2017 written reprimand over his "confrontational attitude" in emails and verbal communications, the two had a conflict over the procedures for hiring a new employee.  Reprimand [63-12] at 6.  On July 11, 2017, Ryan wanted Parker to immediately provide certain documents related to an applicant's employment history.  Parker stated that he could not, and Ryan responded:

> ***That won't work***, as you told us you were calling in your selection on Monday July 17 and I don't work on Monday.  ***This is the problem with micro-managing the process and pushing everything to the last minute***.  Normally information is shared via the portal with all parties involved so that the data is accessible to everyone, this is very important ***considering your absence for the entire period leading up to the deadline.  I understand your [sic] new to the position and you wish to be active*** in all important issues but in this case ***you are hindering rather than helping.***

> In our management meetings you express an interest in leadership and ask questions of us with respect to good leadership.  ***This is an example of poor leadership, monopolizing the data so that the group does not have all the information we need*** nor do we have the opportunity to ask questions to seek clarification during the interview on anything contained in the missing information.  Last week both Chad and I spoke about trust and the importance of trust in a successful supervisor subordinate relationship when you asked us for best supervisory attributes.  ***It is obvious to me that trust has not been evident in this process and is causing us to make decisions under poor conditions***.

> ***Why don't we speak about your lack of trust and confidence in your new staff at our next management meeting.***

> ***This position is important to the office and we should not make a casual selection under less than optimal search results.*** Without knowing the condition of discharge how are we to make an informed decision? ***This whole process has been totally irregular from the outset.***

July 2017 E-mails [63-33] at 1–2 (emphasis added). Parker forwarded the email to Cheryl Duffner, a NWS human resources professional, describing Ryan's email as "inappropriate" and including a proposed response. *Id.* at 1.

After that, Ryan sent other similarly worded emails to Parker, his immediate supervisor. *See* Proposal to Suspend [63-13] at 5 (describing July 13, 2017 email stating, inter alia, "Thanks for your response. I must say that I appreciate it when you respond to my emails as the majority of my emails to you go unanswered" and then criticizing Parker); *id.* at 7 (describing July 15, 2017 email accusing Parker of being "unprofessional and unproductive" and lacking "simple common courtesy"); *id.* at 8 (describing July 18, 2017 email criticizing Parker for his "recent behavior" involving hiring process, accusing him of withholding information, and stating, "I hope in the future you weigh your words more carefully before denigrating and disparaging your staff"); *id.* at 10 (describing July 20, 2017 email complaining that Parker failed to invite a White employee to meetings and concluding, "I hope in the future you are able to show [the White employee] the same measure of respect you have shown [a Black co-worker]").

On August 9, 2017, Parker sent Ryan a notice that Parker was "proposing to suspend [Ryan] for five (5) calendar days without pay." *Id.* at 1. The 19-page notice included the emails listed above and documented what Parker viewed as "unwarranted and insubordinate" conduct. *Id.* at 5. The notice also advised Ryan that he could reply and provide "any and all reasons why this proposed action should not be effected." *Id.* at 18.

Ryan submitted a 55-page reply, but the ultimate decisionmaker, Deputy Regional Director Michael Coyne, was not impressed. Coyne concluded that the majority of Ryan's reply

"dealt with [his] performance and not [his] conduct."  Decision to Suspend [63-14] at 1.  Coyne

stated that he "g[a]ve[] full and careful consideration to the reasons and specifications for [the]

proposed suspension as well as [Ryan's] response," which in his opinion "d[id] not indicate that

[Ryan] t[ook] responsibility for [his] actions."  *Id.*  Coyne therefore adopted Parker's proposal

for a five-day suspension without pay on November 14, 2017.  *Id.*[11]

Ryan now argues that "[t]he allegations in the specifications of the notice of suspension

of five days without pay all are false and without any basis."  Pl.'s Mem. [69] at 9 (citing his

own 55-page reply).  He also provides an affidavit addressing his communications and job

performance.  *See* Ryan Aff. [68-1].  Much like his suspension reply, Ryan mostly explains that

the content of his communications was correct or justified and that his performance was

exemplary.  *See, e.g.*, *id.* at 13 (explaining that comments in email were "accurate and correct");

*see also id.* at 19 (noting co-worker's comment that his work was "outstanding").

The record amply supports Ryan's claim that Defendant credited his good work on many

occasions, but he misses the bigger point:  performance was not the basis for the suspension.  It

was the tone of Ryan's communications that drew the suspension, not the content.  *See* Proposal

to Suspend [63-13] at 2 (recommending suspension for "unprofessional behavior" and cataloging

communications Defendant deemed inappropriate and subordinate); *see also id.* at 11 ("Your

overall condescending, bullying tone towards management and others in this agency will not be

tolerated.").  As Coyne stated in the suspension decision, Defendant suspended Ryan not for his

---

[11] Ryan says Coyne was also motivated to retaliate against him, but Coyne "first became aware
that the Complainant was opposing discriminatory harassment in February 2018," long after
imposing the suspension.  Coyne Decl. [63-21] at 2.  While that seemingly removes causation as
to Coyne, there could still be a potential cat's-paw argument, though Ryan does not make one.
Neither party addresses that in their memoranda, and the point is probably moot because Ryan
fails to show pretext.

"performance" but for "[his] conduct."  Decision to Suspend [63-14] at 2.  And Ryan has not disputed that he sent the offending emails.

Ultimately, an employee's "assertion of innocence alone does not create a factual issue as to the falsity of [the employer's] proffered reason" for the employment action.  *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).  Thus, Ryan "cannot survive summary judgment merely because [ ]he disagrees with [Defendant's] characterization of [his] disciplinary history; rather, '[t]he issue is whether [Defendant's] perception of [Ryan's] performance, accurate or not, was the real reason for'" the decision.  *Evans v. City of Hous.*, 246 F.3d 344, 355 (5th Cir. 2001) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408–09 (5th Cir. 1999)).

Finally, the Court does not, at the pretext stage, "engage in second-guessing of an employer's business decisions."  *Roberson-King v. La. Workforce Comm'n, Off. of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)).  So, given Ryan's own written words, he has not shown that the proffered reason was "false or 'unworthy of credence.'"  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). Ryan has not established pretext, and his retaliation claim therefore fails under Rule 56.[12]

VI.     Hostile-Work-Environment Claim

Ryan claims Parker subjected him to a race-based hostile work environment.  To establish a Title VII hostile-work-environment claim, Ryan must prove:

> (1)[]he belongs to a protected group; (2) []he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment;

---

[12] For these same reasons, viewing the disciplinary acts Ryan did not specifically identify as retaliation would again not alter this result.

> [and] (5) the employer knew or should have known of the harassment in question
> and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  Defendant says Ryan's proof fails to

show he was harassed, that such harassment was based on race, or that the harassment affected a

term, condition, or privilege of his employment.  Def.'s Mem. [64] at 27.

A.      Severe or Pervasive Harassment

Ryan and Parker clearly butted heads, but Title VII is not a "general civility code."

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  "For harassment on the

basis of race to affect a term, condition, or privilege of employment . . . it must be 'sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  *Ramsey*, 286 F.3d at 268 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21 (1993)).  "[The] court[] must consider the following circumstances:  the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Id.* (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)).

The acts about which Ryan complained were not necessarily severe, and some—like

asking Ryan to change a light bulb—were trivial.  Nevertheless, the conduct was arguably

pervasive.  For example, Ryan claims that in the first year or so of Parker's tenure he made

repeated threats to terminate Ryan's employment; slammed a door on him in a way that another

employee viewed as a power play; yelled at Ryan in the office where others could hear; shouted

at Ryan, "I am done with you"; undermined Ryan's authority by going around Ryan to his

subordinates and speaking to them about Ryan; instructed Ryan to leave a meeting in front of

other employees; gave a performance award to an employee for work Ryan performed;

repeatedly told Ryan he did not trust him; informed upper management that Ryan was a liar who

could not be trusted; scheduled meetings when he knew Ryan could not attend; and spoke to

Ryan in a derogatory tone.  Some of the alleged conduct was not a one-time occurrence.

Whether this was severe or pervasive enough to be actionable is a question of fact.

B.    Harassment Based on Race

To prove the alleged harassment was based on race, Ryan first points to testimony by

NWS employees suggesting that Parker favors Black employees.  *E.g.*, Byrd Dep. [68-9] at 51–

53 (describing "tension" that "creates a very toxic work environment" because Parker "ha[s]

favoritism towards a specific race of people"); Campbell Dep. [68-11] at 2 (describing low

morale at the office due to "the racism that's going on in the office as evident by the favoritism

that is going on in the office with a specific group made up of African-Americans that are

receiving special attention, giv[en] special opportunities"); Carpenter Dep. [68-12] at 86 (stating

that Parker's "agenda" is that "he wants [the office] to be all black"); Winesett Dep. [68-14] at

(describing work environment as "toxic" due to "Parker's preferential treatment of specific staff

members" based on "a racial division").  A former colleague in Parker's previous duty station

testified that he told Parker he could not "just advocate for blacks once in Jackson," but Parker

responded that he was being sent to there "to make up for all the racial injustice that's going on

in the weather service."  Stevens Dep. [68-10] at 19.

And as to Ryan, he testified that Parker told him "he wanted to hire based on diversity

African Americans," and "wanted to know why [a Black employee working under Ryan] didn't

have [Ryan's] job."  Ryan Dep. [68-5] at 55.  Against this backdrop, Ryan suggests that the

alleged harassment was designed to remove him from his job so Parker could replace him with

Ryan's subordinate.  *Id.* at 56.  Finally, he claims that Parker attempted to bolster the potential

replacement in various ways, including cash awards and recognitions the employee did not deserve. *Id.* at 63–64.

A 2018 memorandum prepared by NOAA's Workforce Management Office following its "independent internal inquiry into an allegation of harassment at the [NWS's] Jackson, Mississippi Weather Forecast Office," "found no evidence that Mr. Parker's actions toward Mr. Ryan were on account of Mr. Ryan's race." 2017 ROI Part 2 [68-3] at 91, 95. But the memorandum "note[d] that a significant percentage of personnel at the Jackson office hold a perception that racial bias exists at their workplace," with "[m]ultiple interviewees express[ing] concern over their perception that Mr. Parker exhibits racially motivated behaviors." *Id.* at 95.

There are obviously two sides to every incident mentioned in the preceding paragraphs, and correctly promoting diversity does not violate Title VII. But at this stage, the Court must view the evidence in the light most favorable to Ryan. And in that light, a question of fact exists as to the essential elements of a hostile-work-environment claim.

Finally, there is far more in the record than the Court has summarized, and "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). That is the case here.

VII.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Defendant's Motion for Summary Judgment [63] is granted as to the race-based discrimination and retaliation claims but denied as to the hostile-work-environment claim. Its Motion to Dismiss [61] is considered moot. Due to the ongoing

Coronavirus pandemic, this matter is stayed until further notice. *See* Special Order No. 13,

available at

https://www.mssd.uscourts.gov/sites/mssd/files/Special_Order_%2313_as_docketed.pdf.

      **SO ORDERED AND ADJUDGED** this the 18th day of March, 2021.

                              s/ *Daniel P. Jordan III*_____
                              CHIEF UNITED STATES DISTRICT JUDGE